## Town of New Market *v.* Robert Smart.

In a grant "to the inhabitants of a town to be held by them as a body politic and corporate, and to their successors forever," the title vests in the town as a corporation.

In the case of such grant made in 1803, to the use of the minister then settled in the town of New Market, as long as he should be the settled Congregational minister there, and then to be and remain for the use of the minister of that persuasion that shall be settled in that town; the title vests in the town in its parochial, and not in its municipal, character.

Where the voluntary religious Society which existed at the time of this grant, and over which the minister referred to was settled, was afterwards, under the statute of July 3, 1827, organized and became a body corporate and politic, capable of taking and holding real and personal estate for the use of the Society, and the town was no longer charged with any parochial duties in relation to such Society;—*held*, that the legal, as well as beneficial estate in the lands so granted, passed to, and were vested in, that Society, as the successor to the parochial rights and duties formerly belonging to the town.

Where the *cestui que trust* in possession disavows the trust, and claims to hold the land by a title hostile to that of the trustee, and this, by some clear and unequivocal act, is distinctly brought to the knowledge of the trustee, the possession will, from that time, be deemed to be adverse.

In such a case it is not essential that the *cestui que trust* should claim an absolute fee simple or freehold in himself, but it is sufficient if the title claimed be in trust for the use of the ministry in a certain religious society forever.

TRESPASS *Quare Clausum.* It was charged in several counts that defendant had broken and entered plaintiff's close, known as the Parsonage, in South New Market, on, &c., with a continuendo, and had taken the profits and carried away the produce from the same during said time. Plaintiff's writ may be referred to as a part of this case.

Plaintiff's title was derived from one Samuel Towle, who was shown to have been seized of the demanded premises prior to April 18, 1798, and on that day conveyed said premises with warranty, and the same passed through several owners to Robert Pike, Daniel Smith, and Samuel Pickering, who, on the 30th day of May, 1703, in consideration of $900.00, conveyed to the inhabitants of New Market, the Parsonage so called, in said New Market, containing twenty-eight acres, and particularly described, "To have and to hold the same granted premises, with the buildings thereon, with all privileges, &c., to the said inhabitants of New Market, (including the grantors) as a body politic and corporate, and to their successors forever, to and for the use of the minister now settled in said town for and during the term of his ministry in said town, or as long as he shall continue to be the settled Congregational

minister of said town, and then to be and remain as a parsonage for the use of the minister of the Congregational persuasion that shall be settled there." The plaintiff's evidence showed that there was a settled Congregational minister in New Market in 1803, named Thurston, and that he remained there in that capacity till 1808, and that he occupied said parsonage, and that after him there were several other ministers, who preached in town, and in the same house in which Thurston preached, and were allowed by the town to occupy this parsonage down to 1824, though none were settled there after Thurston. The plaintiff also proved that the defendant was in possession of the demanded premises, and had been since 1853, and that the selectmen of the town of New Market, for and on behalf of said town, made an entry upon the said premises December 28, 1861, for the purpose of taking possession for the town, and that they found said defendant in possession, and notified him of their object and purpose in making the entry, and notified him to quit the premises, but that said Smart refused to do so, or to have anything to do or say about it, and they left him there.

No vote on the part of said town of New Market instructing or authorizing the selectmen to make such entry or demand, was shown.

The plaintiff rested, and the defendant moved for a nonsuit, which motion was denied, and defendant excepted. The defendant then introduced the records of the town of New Market, which showed that from 1803 to 1824, the town of New Market transacted the usual town business at the annual town meeting in March, and that another meeting was then called by a warrant of the selectmen, addressed to the legal voters of New Market qualified to vote in ministerial affairs, or to the legal inhabitants of said town qualified to vote in Congregational ministerial affairs, at which certain votes were passed in regard to employing and dismissing ministers, raising money to pay for preaching, in relation to the care and repairs of the meeting-house, and allowing the various ministers for the time being to occupy the parsonage and pay for the use of the same in preaching, at which meetings provision was made that those who dissented, and gave notice of such dissent within a given time, should not be taxed.

It appeared that in February, 1803, at a town meeting duly notified as above, and holden for that purpose, the town voted to purchase a parsonage of David Wiggin, at the price of $900.00, and the selectmen were authorized and empowered to carry the same into effect; and it appeared that the selectmen took the deed from Wiggin to themselves, and then they conveyed the same to the town, which is the deed under which the plaintiff claims. It appeared that in 1803 a tax was assessed by the selectmen for the purchase of a parsonage amounting to $1046.84, that this tax was assessed upon only 158 persons, while the tax of the town for State, county and town taxes was assessed upon 277 inhabitants the same year. In 1824, November 16, a petition was addressed to Henry Wiggin, a Justice of the Peace, by seventeen persons, representing that they were members of the Congregational Society, in New Market, and proprietors and owners of more than one sixteenth part of a lot of land, with the buildings thereon, called the Congregational Parsonage, and

requesting him to notify and call a meeting of said Congregational Society, they being the proprietors of said parsonage according to law, &c., to see if said Congregational Society, or proprietors, will repair said buildings, or sell the whole.     Said Wiggin called a meeting by a warrant addressed to "the Congregational Society, proprietors and all interested in the above premises," at which meeting, held December 6, 1824, appointed a society's clerk and adjourned; and at the adjourned meeting voted that a committee of three persons be appointed to sell the Congregational parsonage at public auction, as soon as may be at the discretion of the committee, and deed the same to the purchaser, and said committee was appointed.     On March 27, 1827, Henry Wiggin, as clerk of the Society, in pursuance of a petition signed by twenty-seven.persons belonging to said Society, called a meeting by a warrant addressed to the inhabitants of New Market, belonging to said Congregational Society, in said town, to see whether the Society will vote to repair the parsonage or sell the same at public auction.     At a meeting held pursuant to that warrant, it was voted that the proceeds of the income of the parsonage the last two years and the present year be appropriated to the repairing of said parsonage house the present year, and adjourned to the first Monday in April, A. D., 1828.     At said adjourned meeting, after transacting business and appointing a committee to settle the affairs of the Society for the present year, adjourned to the first Monday in April, A. D., 1829, at which meeting it was voted that the business heretofore transacted by the nominal Congregational Society, in future be transferred to the wardens of the Society, and that the present committee have recourse to the same when necessary.     Before this, a special meeting was called by the clerk of the Society, on a petition of ten persons, to see if the Society will adopt a constitution and report themselves a body corporate.     The meeting was held January 5, 1829, at which it was voted that the article in relation to adopting a constitution, &c., be dismissed.

The evidence tended to show that certain individual inhabitants of New Market, on the 16th of January, 1829, organized under the statute of July 3, 1827, and formed themselves into a religious society, by the name of the South Congregational Society of New Market, and made a record of the proceedings.     On the same day a constitution was adopted by said Society, which is signed on the book of records by thirty-five persons, a majority of whom were proved to have attended some of the meetings of those qualified to vote in ministerial affairs between 1803 and 1829.     A notice of the formation of said Society was published in the Portsmouth Journal, a newspaper printed in Portsmouth, in said County, on February 7, 1829.     The writing which was recorded organizing said Society, and the notice published in said newspaper, may be referred to.     The constitution provided, among other things, that three wardens and a clerk should be chosen annually by ballot, and that they should be duly sworn to the faithful discharge of their duties before entering on their office, and that any person might become a member of the said Society, by subscribing the constitution.     After the constitution, the Society recorded in their book of records the deed to the town of New Market, of

the parsonage, under which plaintiff claims, since which time the evidence tended to show that there had been an annual meeting of this Society every year at the time prescribed in the constitution. At these meetings the records of the Society are, that the Society "voted C. S. clerk," "voted C. D., E. F. and G. H. wardens," but it does not appear that they were chosen by ballot, or that they were sworn, except in one or two instances, and it did not appear that the warrants were duly posted or proper notice of the meetings given. The plaintiff objected to these records on these grounds, but defendant offered to prove that the said officers were in fact chosen by ballot, and that they were always duly sworn, and that due notice was given of the meetings, and the evidence was admitted.

At every annual meeting there was an article in the warrant to see what the Society would do with the parsonage that year, and a vote to appropriate the income of the parsonage for the support of preaching, except a few years, when the income was voted to be expended in repairs. And it appeared that said Society had occupied or leased, and had had the income of said parsonage from 1829 to 1853, and that said Society had preaching of the Congregational order a portion of the time each year from 1829 to 1840, when they procured a new meeting house and settled a minister of the same order, and have had constant preaching, either by a constituted minister or a stated supply ever since, till the spring of 1862, when their minister died. In 1849 the town of New Market was divided, and the South Congregational Society, with their meeting-house and this parsonage in question, came within the town of South New Market. Said act of the Legislature dividing the town may be referred to. There was another Congregational Church and Society in New Market, which commenced about 1829, and which have had preaching of the Congregational denomination, and have had much of the time, and have now, a settled minister of that persuasion, and a meeting-house, and this house, church and society are in New Market since the division of the town. In the warrant of said South New Market Society for a meeting in 1853, there was this article : "To see if the Society will authorize the wardens to sell the parsonage, so called, belonging to said Society," and at the meeting the Society, "Voted, to lease the parsonage and put the money into some other real estate for the benefit of the Society, and to carry out the design of the original donors. Voted, that it be left to the wardens to fix on the price." In pursuance of this vote the wardens of this Society leased the parsonage for ninety-nine years, to Robert Smart, for the sum of $800.00.

It appeared that this parsonage was nearly two miles from the meeting-house of this Society, and that it was not convenient for the minister, and that the money obtained of Smart for this lease was invested in a lot of land near the meeting-house, and that the Society built a new house thereon, and made a good and convenient parsonage, costing, land and all, about $2500.00, which has since been occupied by the minister, and that it was understood and determined by said Society, that said property in the old parsonage be thus transferred to the new parsonage,

to be forever thereafter held and used by said Society, according to the design of the original donors.

The plaintiff then introduced the records of the town for the years 1825 and 1841, from which it appeared that in 1825, at a town meeting duly notified and holden, " To see how the town will dispose of the parsonage house and land belonging to said New Market," it was voted to dismiss said article in the warrant.   In 1841, the 8th article in their warrant for town-meeting was " to see if the town would vote to sell the property known and designated as the parsonage in said town, and to have the avails divided to the different religious denominations in said town, agreeably to a petition, &c," and at the meeting held in pursuance of said warrant, it was voted that the 8th article in the warrant be indefinitely postponed.

John B. Rider, a witness for the defendant, testified that he had been a warden of said Society since 1848.   On cross-examination, he testified that he acted for said Society in making the bargain with the defendant to lease to him the parsonage ; and, subject to the defendant's exception, he testified that while making the bargain the defendant talked with him about the title, and told him he should want an absolute deed ; that the witness told the defendant the property was so held it could not be deeded, and that the Society could give nothing but a lease.

Upon this evidence the court ordered a verdict for the plaintiff, and the defendant excepted.

*Christie,* for defendant.

I. The motion for a nonsuit should have been allowed or prevailed for the reasons following, viz :

1. The deed, upon which the plaintiffs relied to show title in themselves, was not a deed or conveyance to the town of New Market, but was a conveyance to the inhabitants of the town of New Market, and, we submit, conveyed no right or title in or to the premises to the *town* of New Market.

2. But, if it be held to be a conveyance to the town of New Market, it was only a conveyance in trust to and for the use of such Congregational minister as then was and such as might thereafter be settled in said town ; and as there was at that time a Congregational minister settled in said town, the use was at once executed in him and his successors.   And he and they only successively could maintain an action for the recovery of, or for injuries done to, said premises.   And when there is no such minister settled in said town, the title is in abeyance, and no such suit can be maintained till one is settled.   Comp. Stat. Chap. 170, sec. 10 ; *Weston* v. *Hunt,* 2 Mass. 500 ;   *Brunswick* v. *Dunning*; 7 Mass. 445 ; *Brown* v. *Porter,* 10 Mass. 93 ; *Cheever* v. *Pearson,* 16 Pick. 266.

3. It did not appear that the plaintiffs had, in any way, had any possession or control of the said parsonage lot, at any time after the year 1824, till the entry of the selectmen, December 28, 1861, a period of

more than thirty-five years, which great lapse of time *prima facie* tolled and barred any and all right of entry in or by the plaintiffs.

II. Upon the whole evidence, the verdict should have been for the defendant.

1. Because the defendant and those under whom he holds and claims, at the time of the commencement of this action, had held and occupied the premises adversely and under a claim of right for much more than twenty years, without interruption or disturbance, and on this ground, if no other, had become the owners thereof.

2. Because, from the evidence reported, it appears that defendant's lessors were and still are the Congregational Society in New Market, or the successors thereof, by and for whom the said parsonage was bought and paid for, and who, down to the time of their lease to the defendant, always had the control and income of the same, according to and for the purposes contemplated in the said deed to the town, which was made to them only in trust for and to the use of said Congregational Society, or the successive ministers thereof.

3. The town are trustees only and have no right to disturb or interfere with the *cestui que use*, in the enjoyment of the trust property, unless to prevent the perversion thereof from the true purposes of the trust. And we submit, that, upon the evidence, there has been no such perversion.

4. If the town recover damages in this case, what are they to do with the money thus recovered? It would be only *trust* property, and therefore could not be held or applied to the use of the town. And we contend and submit, that, upon the evidence reported, it would be recovered to the use of the defendant's lessors or to the use of their settled minister, which would be idle and absurd.

5. The town, *as a town*, never had, claimed, or exercised any right or control in or over this parsonage lot, and less than three-fifths of the tax-payers of the town ever paid anything towards the purchase money thereof. Those who purchased and paid for the said parsonage lot, were the members of the then Congregational Society in New Market, and they and their successors have ever since managed, possessed, and controlled it; though down to 1824, their meetings were called and their records were kept by the town officers. But they were not meetings of the town, but of the Congregational Society, and were so warned and conducted, and the members of said Society *only* voted or acted in said meetings. Since 1824 the said Congregational Society and their lessees, or their ministers, have had the sole control and income of the said parsonage, and, as we contend, are still entitled thereto.

*Small*, for New Market.

I. The motion for a nonsuit was properly denied. The court should not order a nonsuit when the evidence would authorize the jury to find a verdict for the plaintiff, or where the court would not set it aside, if so found, as against evidence. And a new trial will not be granted for improperly refusing to nonsuit, if evidence subsequently adduced in the

course of the trial is sufficient to sustain the plaintiffs' case.    2 *Gra. & Wat. on New Trials*, 690.

The evidence abundantly sustained the plaintiffs' case.

(1.) The plaintiffs' deed conveyed to them the title in trust.    *Chapin & Wife* v. *Dist. No. 2*, 35 N. H. 455, 445, and cases cited.

Where an estate is conveyed to trustees the legal estate will vest in them whenever it is necessary for the purpose of effecting the trust. *Upham* v. *Varney*, 15 N. H. 466—7; *Troy* v. *Haskell*, 33 N. H. 538; 1 Greenl. Cruise, *387.

There having been no statute in this State for the regulation of property given for pious uses, *Baptist Soc.* v. *Candia*, 2 N. H. 20, and ministers here not being corporations and having no legal successors, but the duties, rights and relations of each minister to the parish and the parsonage being but temporary, it was necessary, in order to protect the trust, that the legal title should vest in the town, and it did so vest. *The 2d Cong. Soc.* v. *The First Soc.* 14 N. H. 315; *Brown* v. *Concord*, 33 N. H. 285; *The Dublin Case*, 38 N. H. 459; *Troy* v. *Haskell*, 33 N. H. 533; *Norton* v. *Leonard*, 12 Pick. 156-7; 1 Greenl. Cruise, 358, note.

The authorities cited by the defendant, rest entirely upon special statutes of Massachusetts, whereby the ministers of the several protestant churches there are made sole corporations capable of taking in succession any parsonage lands granted to the minister and his successors, or for the use of the ministry.    Those cases can be of no authority here.

This land was bought with the town's money, and it could not have been the intention, and the town had not the right, to give it to the minister who happened to be there at the time the purchase was made.

To say that the mere lapse of time, unaccompanied by evidence of adverse possession or claim, tolls or bars the right of entry of a corporation upon land they had bought and paid for, and which they had occupied more than twenty years under their deed, is, at the least, a novelty.    Ang. on Limit. chap. 31, sec. 5; Stearns R. Actions, [239.]

II. The verdict is right.

It is well known that, prior to 1819, towns in this State partook of the character both of a parish and a town, parochial duties were performed by them, and parochial property was held by them in their corporate capacity.    The powers given them to raise money by taxation to build churches and support a christian ministry, were given them among other powers merely municipal in the act for regulating towns, 2 N. H. 511; and it was competent for towns thus situated to proceed parochially in all matters touching the support of public worship; and they might conduct such business at distinct meetings from those of the towns, or at the same meeting, at their pleasure, *Jewett* v. *Burroughs*, 15 Mass. 467, *Ford* v. *Clough*, 8 Greenl. R. 334; and all the qualified voters had a right to vote if they chose, at such meetings.    There is no evidence that any were excluded.

Rights accruing to towns in their parochial capacity could be joined

in an action with those accruing to them in their municipal capacity. *Alna* v. *Plummer,* 3 Greenl. R. 88.

In pursuance of the authority thus given to towns by the legislature, the money for the purchase of this parsonage was raised by the town by taxation, the deed was taken to the town, and the property vested in the *town,* and not in any number of *individuals* in the town. No Congregational Society existed in the town, other than the town itself, and until 1819 we had no public act creating parishes and defining their powers; all parishes before that time were created by private acts. *Baptist Soc.* v. *Wilton,* 2 N. H. 211.

Individuals belonging to a town .cannot by any action whatever recover a share of the funds of a town to be applied to their own separate use.

The town, as a *town,* had and exercised the entire control over this parsonage lot, in the only way in which they could do so consistently with the purpose for which it was purchased.

By what sort of magic is it, then, that the defendant claims that the title to these premises passed from the plaintiffs to the persons now styling themselves the South Congregational Society, not pretended to have been organized until twenty-six years after the conveyance to the town?

They claim under no paper title, nor are they legitimate successors of the town. The only other mode by which the defendant could acquire title, is by adverse possession. On this ground the defendant seems to claim that he is the owner of the fee. I answer—

(1) Neither the defendant nor his lessors ever claimed the fee, and the law cannot confer upon them a greater estate than they claimed for themselves, Stearns on Real Actions, [238] ; and I submit that no limited estate other than an easement can be acquired by adverse possession immediately against the owner of the fee.

(2) The defendant's lessors always admitted the title of the town and that they held under the town. They recorded the deed to the town in said book of records immediately after their constitution and before any society business had been done.

(3) The defendant claims under his lessors as a *corporation,* and there was no competent evidence of the organization or existence of any such corporation, nor that any legal officers of such corporation had ever been chosen, or any legal meetings or other proceedings had by such corporation. The parol evidence offered in aid of the records was not admissible for that purpose, and did not render the records competent. It was only admissible upon a motion to amend the records.

(4) This is a case of direct trust. The possession of defendant's lessors was consistent with the trust. They were at most tenants at will of the town, and the statute of limitations does not apply. Ang. on Limit. 507, 517 ; 1 Greenl. Cruise, [352], 381, and *407 ; *Keene* v. *Dearborn,* 8 East 248 ; 3 Phillips Ev. 581, (*Last Ed.*)

(5) The conveyance by defendant's lessors to the defendant, terminated their tenancy, and the defendant, upon entering, became a disseizor as matter of law, and the question was not for the jury ; Co. Litt.

55, b. ; Comyn, Title, Estate, H. 2, H. 7 ; *New Market Manf. Co.* v. *Pendergast*, 24 N. H. 54 ; and the town was bound to interfere to protect and administer the trust.

The damages recovered by the town will be received to be administered and applied in the same manner that the income of the parsonage should have been, under the deed, and I claim that it should go to the settled Congregational minister in New Market.   So long as there was no other Congregational minister in the town that claimed the use of the parsonage, the town might well regard the one at South New Market as the proper recipient of the fund ; but when the town was divided and a Congregational minister was settled in New Market over a Congregational Society, older than the one in South New Market, it may well be claimed that coming both within the letter and spirit of the deed, the one at New Market should enjoy the property.

There can be no difficulty in equity in compelling towns to execute such a trust.   *The Dublin Case*, 38 N. H. 577.

The evidence of the defendant did not tend to show a defense.   It showed that his lessors entered without any color of title in themselves, and they are presumed to have entered as tenants of the town in whom the freehold was vested, and their possession and the possession of the defendant are presumed to be the possession of the town, till the contrary appear, and neither the defendant nor his lessors ever claimed an estate in the premises amounting to a freehold.

The defendant's evidence shows his lessors to have been merely the tenants at will of the town, and their tenancy was terminated by their lease to defendant, and defendant took nothing under the lease.   *Lund* v. *Parker*, 3 N. H. 49 ; *Towle* v. *Ayer*, 8 N. H. 58 and 59 ; Co. Litt. 330, b. note 285 ; *Whitney* v. *Swett*, 22 N. H. 10 ; *Currier* v. *Perley*, 24 N. H. 219.

BELLOWS, J.   The *locus in quo* was conveyed by persons having title, May 30th, 1803, to the inhabitants of New Market, to have and to hold the same granted premises, with the buildings thereon, to the said inhabitants of New Market as a body politic and corporate, and to their successors forever, "to and for the use of the minister now settled in said town, for and during the term of his ministry in said town, or as long as he shall continue to be the settled Congregational minister of said town, and then to be and remain as a parsonage for the use of the minister of the Congregational persuasion that shall be settled there."

It is objected that this is a conveyance to the inhabitants of New Market, and not to the town as a corporation ; and therefore that this action must fail for want of title.   But we think the objection is not well founded, as the grant was to the inhabitants in their collective capacity as a permanent body and having successors, and with the power to hold the land forever, and this is not an unusual mode of describing a municipal corporation ; *Chapin & Wife* v. *School District*, 35 N. H. 450, where the conveyance was to that part of the inhabitants of Winchester that now does, or may hereafter, inhabit within the second School District in said Winchester forever, for the sole purpose of supporting a

school in said district, *habendum* to the inhabitants of said School District and their successors forever, and it was held that this took effect as a conveyance to the District.

See also, *Foster* v. *Lane & al.*, 30 N. H. 305 ; Mayor, &c., Lynne Regis, 10 Co. R. 123, a. note ; *Master &c., of Sussex and Sidney College* v. *Davenport*, 1 Wils. 184 ; Angell & Ames on Corp. 206, and cases cited ; 4 Greenl. Cruise Dig. 264.

The question then arises, whether the title acquired by this grant vested in the town in its municipal, or in its parochial, character, and if in the latter, whether the town still retained such title after the incorporation of a parish, and after the town had ceased to have parochial rights and duties.

It is quite clear that such rights and duties belonged to towns before the law of 1819, known as the toleration act, and continued after that act in respect to contracts then existing with settled ministers ; and that in the discharge of those duties the action was in the name of the towns, and through the instrumentality of town meetings, although members of dissenting religious sects neither acted in such meetings, nor were subject to be taxed for such purposes, as appears to have been the fact in the case before us. Such also was the fact in Massachusetts. *Dillingham* v. *Snow & al.*, 3 Mass. 282 ; *Same* v. *Same*, 5 Mass. 547 ; *Jewett* v. *Burroughs*, 15 Mass. 464 ; *Milford* v. *Godfrey*, 1 Pick. 91.

And it is equally clear that these parochial rights and duties were largely exercised by parishes, distinct from municipal organizations ; and for that purpose, towns were often divided into two parishes, to which by law were committed these parochial duties. In other instances, such parishes were composed of parts of two or more towns.

If no other provision for the performance of such parochial duties was made, it was by a general law imposed upon the towns.

In Massachusetts every town is considered to be a parish until a separate parish be formed within it. *First Parish in Brunswick* v. *Dunning & al.*, 7 Mass. 447 ; *Ludlow* v. *Sikes*, 19 Pick. 323.

The grant, then, being for the use of the Congregational minister then settled in town, during his ministry, and then to be and remain for the use of his successors in that office, the title must be regarded as vested in the town in its parochial character, and not in its municipal capacity.

In Massachusetts this distinction is fully recognized in numerous judicial decisions growing out of the grants in the original charters of towns, of a share or right of land, for the first settled minister, and another for the use of the ministry ; it being held there, that those lands were granted for pious uses, to be held in trust as a permanent fund for the support of religious worship, and accordingly by an early provincial statute, re-enacted under their State constitution, ministers of protestant churches were made sole corporations capable of taking in succession any parsonage lands granted to the minister and his successor, or granted to the use of the ministry.

This idea was evidently borrowed from the common law, by which the parson of a church, as a sole corporation, was deemed to be seized in right of the church, *jure ecclesiæ*, of all the church lands.

Hence, in Massachusetts, as in most, if not all the towns, lands were set apart for the minister, or the ministry, numerous questions arose as to the application of the funds accruing from such lands, and the state of the titles, which were settled by their courts.

In New Hampshire, on the contrary, as the courts have decided, in accordance with long usage, that the lands or shares so set apart for the first settled minister, and for the use of the ministry, vested absolutely, in the one case, in the first settled minister, and in the other, in the town, and were not held in trust for pious uses; see *Baptist Society in Wilton* v. *Town of Wilton*, 2 N. H. 508; *Candia* v. *French*, 8 N. H. 133. Questions of this sort have rarely been the subject of judicial investigation.

But, still, wherever there are grants to pious uses, as in this case, they are to be interpreted by the principles of the common law as modified by statute or usage.

By the common law, as the church was not a body corporate capable of holding an estate in lands, the rector was deemed to represent it; to take upon himself the *person* of the church, *personam gerit*, and as such when inducted into office became seized of the church property, including the glebe, the church edifice, tithes and oblations; but he was seized only in right of the church, and had no power of alienation beyond the time of his ministry; and, therefore, on his resignation, death, or deprivation, the freehold was said to be in abeyance until his successor was inducted into office. Com. Dig. Tit. Ecclesiastical Persons, C. 9, and also, Tit, Abeyance, A. 1 to 3; Co. L. 341, a.; Co. L. 300, a.; Com. Dig., Esglise G., 1; *Town of Pawlet* v. *Clark*, 9 Cranch, 292, where is a learned opinion of Story, J.

It is obvious that the estate of the parson is peculiar. It is not a fee simple, for he cannot lease the land beyond the term of his office, nor is it strictly an absolute estate for life, because it terminates by his resignation or deprivation; but the freehold is so far in him, that he may maintain a real action to recover it. The fee simple, however, by the early authorities, is held to be in abeyance, even although there be a parson in office; the church having no capacity to take it. Co. L. 341, a.; Com. Dig., Abeyance, A. 1 to 3.

But, however this may be, and whether the fee simple may be regarded as in abeyance during the life of the parson, or not, the glebe is the dowry of the church, and in its right is it held by the parson. *Pawlet* v. *Clark*, 9 Cranch, 329, and cases cited.

In Massachusetts, where the minister is by statute made a sole corporation, capable of taking in succession the parsonage lands, it is held that his rights are clearly defined at common law; that he holds the lands in right of the parish or church; that, on his resignation, deprivation, or death, the fee is in abeyance, until there be a successor; and that during the vacancy, the parish or church have the custody, and are entitled to the profits of the parsonage. *Weston* v. *Hunt*, 2 Mass. 500; *First Parish of Brunswick* v. *Dunning & al.*, 7 Mass. 445.

So it is held in Massachusetts, that lands granted to a town for the

use of the ministry, vest in the town in its parochial capacity, and that upon the erection or incorporation of the first parish in said town, the lands vest in the parish, which succeeds to the parochial rights and duties before belonging to the town; *Milton* v. *The First Parish in Milton*, 10 Pick. 447. This was a writ of entry by the town of Milton against the First Congregational Parish in Milton. This parish was duly incorporated in 1818, and consisted of all the Congregational inhabitants, not belonging to any religious Society out of town; and provided that the parish should be deemed to be the successor to the town, as far as relates to parochial proceedings, rights, immunities, duties, contracts, and undertakings; and also, that nothing in the act contained should be construed to divert the use of the ministerial lands from the intention of the donors; or as altering or affecting the title to any such real estate. Upon the principles before stated, the plaintiff was nonsuited.

Ordinarily, upon the creation of a parish composed of a part of a town divided geographically, or consisting of such inhabitants as are attached to a particular religious sect, which is termed a poll parish, what is left is by statute in Massachusetts, deemed to be the first parish; and the minister of that parish holds all the lands to him and his successor, which he held as minister of the town before the separation. *First Parish of Brunswick* v. *Dunning & al.*, 7 Mass. 445, decided in 1811. In this case, which was trespass for breaking and entering the plaintiffs' close, being a lot of land laid out by the Pejepscut Proprietors for the use of the ministry, it appeared that the last settled minister was dismissed in the year 1800; and it was decided that the parish was entitled to the rents and profits of the land, and to the custody of the same, during the vacancy in the pastoral office, and was therefore entitled to recover. See also, *Minot* v. *Curtis & al.*, 7 Mass. 441, which is the case of a poll parish; *Sutton* v. *Cole*, 8 Mass. 96; *First Parish in Medford* v. *Medford*, 21 Pick. 199. So in *Ludlow* v. *Sikes*, 19 Pick. 317, where the town sold the land granted for the use of the ministry, and applied the income derived from the price to that use, held that the town took the property in its parochial capacity, and that upon the separate organization of the first parish the fund became the property of that parish; and also held that whether the town act in its parochial capacity, or otherwise, is often determined merely by the nature of the act done. See also, *Shrewsbury* v. *Smith*, 14 Pick. 297.

The case of grants and dedications to public and religious uses, forms an exception to the general rule applicable to private grants, which requires a grantee capable of taking the estate; whereas, in the former, the grant may take effect, although there be no grantee *in esse*.

Upon this ground it was decided in *Pawlet* v. *Clark*, 9 Cranch, 292, before cited, that a grant by the crown of a township in sixty-eight shares, one of which was appropriated "for a glebe for the church of England, as by law established," would take effect as a grant of that share to the parson of the church of England in that town, whenever such church was there established, and a parson inducted into office, although at the time of the grant no such church existed, nor any grantee capable

of taking the fee; that the parson when so inducted, would take the land as an endowment, to be held in right of the church, *jure ecclesiæ;* and that in the mean time the fee would be in abeyance without any power in the crown to resume or recall the grant.

Upon a similar principle is the case of *Beatty* v. *Kurtz,* 2 Peters 566, where a lot of land was marked off "for the Lutheran church," upon a recorded plan and survey, for a burying ground, but no grant made, nor was such an incorporated Society in existence; but the land was used for interments for many years. The court consider the dedication of property to public or religious uses as an exception to the general rule requiring a particular grantee, and like the dedication of a highway to the public.

So in *Cincinnati* v. *White's Lessees,* 6 Peters U. S. Rep. 431, it was held that an owner may dedicate land to the use of the public as an open square, without the legal title passing from him; and yet the public acquire a vested interest in it, so that the owner cannot maintain ejectment to recover possession of it; and the court put it upon the same ground as dedications for charitable and religious purposes, and for public highways, where there is no grantee *in esse* to take the fee; and it is said that these cases are exceptions to the rule applicable to private grants, and from necessity. See also *Second Cong. Soc. in Hopkinton* v. *First Cong. Soc. in Hopkinton & al.,* 14 N. H. 314.

Upon similar views, has been the course of the legislation in New Hampshire, it having been provided by ch. 144, sec. 7 of the Revised Statutes, that in the case of grants to unincorporated religious societies, such societies shall have the like power to manage, use and employ the same, as incorporated societies now have or hereafter may have by law; and also, empowering them to sue and be sued in respect to such grants; and generally making them a corporation so far as necessary to effect the purposes of those provisions.

So, also, by sec. 8 of the same chapter, the trustees, deacons, church wardens, or other similar officers, of all churches and religious societies, are made bodies corporate for the purposes of taking and holding in succession, all grants or donations, whether of real or personal estate, made either to them and their successors, or to their respective churches, or to the poor of their churches.

Sec. 10 provides that the minister of every church or religious society of whatever denomination, shall be capable of taking in succession, any parsonage land granted to the minister and his successors, or to *the use* of the ministry; or granted by any words of *like import;* and may prosecute and defend in all actions touching the same.

It is further provided by sec. 12, that no conveyance by any minister, of lands by him held, shall be valid any longer than he shall continue to be such minister, unless the conveyance be made with consent of the town, parish, or religious society, of which he is minister, or unless he be a minister of an Episcopal church, and shall make the conveyance with the consent of the vestry. And sec. 11 requires that in conveyances by the trustees or deacons of any church, the consent of the church, or vestry shall be had.

It is obvious that these provisions in respect to the granting, holding and disposition of lands designed for the use of the ministry, are in substantial accordance with the common law, and with the course of the courts in Massachusetts, under the provisions of their statutes; and although they were enacted some years after the formation of the South Congregational Society in New Market, as an incorporated body, they afford a strong argument in favor of adopting the provisions of the common law, and the decisions in Massachusetts and elsewhere under it, and give to those decisions, a weight which they might not otherwise be entitled to.

Indeed, the provision in sec. 10, before cited, empowering ministers to take in succession lands granted to them, or to the use of the ministry, or granted by any words of like import, looks much like placing ministerial lands in New Hampshire upon the same footing as in Massachusetts.

A similar principle seems to have been applied to the *transfer* of the rights acquired under such grants, as well as to the grants themselves, by the courts; by which in the case of land granted for the use of the ministry, the freehold has been deemed to be in the town or parish, according as the parochial rights and duties were found to be in the one or the other, and shifting as those rights and duties by law pass from the one to the other.

Indeed, considering the nature of such grants, and that no grantee *in esse* capable of taking the fee is necessary, there can be no objection, as we can see, to holding that the person or corporate body having the duty of making application of the fund to its legitimate uses, is so far seized of the property as to be able to hold it against the original grantor, and also to maintain a suit to recover possession of it.

In the *Dublin Case*, 38 N. H. 484, a bequest was made to a town in trust for the support of the christian religion in a religious society in that town, the interest to be paid to its minister. This was then a voluntary society, but after the testator's death, it became a corporation under the statute; and it was held that the beneficial interest in this fund vested in the corporation, although formally not the same body as the other.

In New Hampshire, the minister was not, until the Revised Statutes, understood to be a sole corporation capable of holding ministerial lands in succession; but the same object was often sought to be accomplished by a conveyance to the town, to hold in trust, for the use of the ministry, especially where no incorporated religious society, capable of taking the title, existed. But upon the incorporation of the parish entitled to the use of the property, so as to render it capable of taking the title, and in fact, making it the successor of the town in respect to its parochial rights and duties, such title, though but the legal estate, would, upon the principles adverted to, become vested at once in the parish, and to this we can see no objection.

It is true, the grant may be in such terms as to show an intent to make the town a perpetual trustee—and in such case the law would carry it

into effect; but when the grant is to the town for the use of the ministry, or the settled minister, as in this case, it may well be regarded, as in Massachusetts, as set apart for the support of public worship, and as vesting the title in the town in its parochial character, and in such legal body as may afterwards succeed to such parochial rights and duties.

To hold that the property in this case vested in the town in its municipal character, would be manifestly unjust and contrary to the plain purposes of the grant, which was to aid in the support of a minister, in that place, of the Congregational persuasion; and especially as the taxes from which the price was paid were assessed not upon the inhabitants of the town generally, but as the jury might have found, upon that portion only who belonged to the Congregational Society, or at least who did not belong to any other religious sect, as such only, under our Bill of Rights, could have been lawfully taxed. Besides, the money was actually raised at a meeting called, not of the inhabitants generally, but only of those qualified to vote in Congregational ministerial affairs, although acting in the name of the town; thus furnishing an example of the distinction alluded to between the parochial and municipal character with which the towns were invested.

At the time of this grant, there appears to have been a Congregational Society in the town with a settled minister, and there is evidence from which a jury might have found, that, in 1829, the individuals composing it were organized under the statute of July 1827, and became a body corporate and politic, capable of taking and holding real and personal estate for the use of the Society; that from this time this Society managed the parsonage without interruption from the town until December, 1861, occupying or leasing it and receiving the income during all that period, and maintaining, every year, religious worship of the Congregational order at the old house until 1840, when they procured a new one, which they have ever since occupied.

Under these circumstances and with the other evidence adduced, the jury might have found that the Society thus organized as a body corporate, was substantially the same as the voluntary religious Society in existence at the time of the grant in question, and for the use of whose settled minister the grant was made. See the *Dublin Case*, 38 N. H. 513.

Upon such a finding, the Society having all the powers of the body politic, known as a parish, and having thus succeeded to the parochial rights and duties, which in respect to religious worship of the Congregational order at this place, had before belonged to the town, and the town being entirely divested of such rights and duties by the law of 1819, there being then no settled minister in that town, there could, as we conceive, be no objection to holding that the title to this land became vested in the Society.

In respect to parishes in Massachusetts, it is, as we have seen, well settled that such is the law, and no difference is perceived between those parishes and such incorporated religious societies.

Indeed, it is expressly decided in *First Parish of Sutton* v. *Cole & al.*, 8 Mass. 96, that such incorporated society is to every intent a

parish; and that in their Bill of Rights, and in their laws, the terms, parish, and religious society, have the same meaning and effect.

By our laws of 1819 and 1827, religious societies formed under them, were declared to be bodies corporate and politic, with perpetual succession, and with all the powers, privileges, and immunities, and subject to all liabilities, incident to corporations of a similar nature; and with power to purchase and hold land for a place of public worship, and for a parsonage house and other buildings connected therewith, and for supporting the ministry in said society; and to improve, sell, convey, and dispose of the same for the sole use of the society; giving such societies powers to choose the necessary officers, make by-laws, and to raise and assess taxes upon the polls and estates of its members; and giving to the assessors and collectors of such societies, the same powers in assessing and collecting taxes, and subjecting them to the same penalties, as similar town officers are liable to.

The powers thus conferred upon these societies are ample, so far as parochial affairs are concerned, and as much so, for aught we can see, as those conferred upon parishes; and we can perceive no objection to holding that where such society is the successor of the town in respect to its parochial *duties*, it also succeeds to its corresponding parochial *rights*. In both respects the society is the legitimate successor of the town, which, although it may continue to exist in its municipal capacity, has no longer its parochial functions; they being transferred to the parish which succeeds it, by operation of law.

The objections in the way of taking this view are more formal than real, arising mainly from these separate municipal and parochial functions being exercised under the same corporate name; but bearing in mind that there were substantially two different corporations, and that the new parish has succeeded to the rights and duties of one, the propriety of holding that it takes the lands held by it for parochial use, becomes apparent; especially when as to such public rights and interest no embarrassment arises from the want of a deed of conveyance.

If, then, the religious Society in New Market, so incorporated in 1829, is found to be the successor to the voluntary Society existing at the time of this grant, and thus has succeeded to the parochial rights and duties in respect to that parish, which before belonged to the town, we think the Society has such an interest in this parsonage that it cannot be deprived of its possession by the town.

So far as we have discovered, these views have not been the subject of discussion in our courts.

In *Brown* v. *Concord*, 33 N. H. 286, where in 1807 there was a devise to the town of Concord "for the use and support of the Congregational gospel minister, who shall exercise the duties of that office, where the meeting house now stands, forever," it was held that this was not a devise upon condition that the town should forever support such minister; nor was this clause a conditional or contingent limitation of the devise; and that on there ceasing to be such minister, the heirs of the devisor had no interest in the estate; but in such case, the whole would go to the town.

In this case no question was raised between the town and the religious society, nor whether the town took the title in its parochial or municipal character; but the only question was whether the heirs had any interest in the property when there ceased to be such minister at that place.

As the verdict is to be set aside, it is unnecessary to examine the question of adverse occupation as raised on the evidence reported.

It is, however, unquestionably true, as a general proposition, that the possession of the *cestui que trust* will not be deemed to be adverse so long as it conforms to, or is consistent with, the terms of the trust deed; or in other words, so long as the trust is a continuing and subsisting one, and acknowledged and acted upon by the parties; but when it is disavowed by the party in possession, whether it be the trustee or *cestui que trust*, and he distinctly with the knowledge of the other disclaims to acknowledge the trust, and to hold under it, then the possession from that time becomes adverse.

The act or disclaimer, however, which is thus to change the character of the possession, should be clear, unequivocal, and distinctly brought to the knowledge of the other party.

These views are fully recognized in the case of *Tripe* v. *Marcy*, 39 N. H. 445, and cases cited; *Willison* v. *Watkins*, 3 Peters, 47, 52; *Kane* v. *Bloodgood*, 7 Johns. Ch. Rep. 90, where the cases are ably reviewed and considered; Angell on Lim. 161, 171—4; *Boone* v. *Childs*, 10 Peters, 223; *Livingston* v. *Pendergast*, 34 N. H. 551; see also *Zeller* v. *Eckert*, 4 How. U. S. 289; *Sherman* v. *Champlain Trans. Co.* 31 Vt. 162; and *Atty. General* v. *Prop. of Meeting House in Federal Street, Boston*, 3 Gray, 1.

This doctrine was directly applied to the case of landlord and tenant in *Willison* v. *Watkins*; and to that of mortgagor and mortgagee in *Tripe* v. *Marcy*; and was recognized by both cases as applicable to the relation of trustee and *cestui que trust*, and to tenants in common; as it is, also, by Chancellor Kent in *Kane* v. *Bloodgood*. Some confusion has arisen upon the subject of the statute of limitations in respect to trusts, from the rather loose and inaccurate language of some of the earlier cases; from which it has been laid down in general terms that no length of time bars the claim between the trustee and *cestui que trust*; as in *Bickford* v. *Wade*, 7 Sumner's Vesey, 87, and note C; but, upon a careful examination, the principle is found to apply only to those technical trusts which are the mere creatures of equity, and not within the cognizance of courts of law, at all, but that wherever the trusts are subject to remedy by action at law, the statute of limitations will be applied in equity the same as at law. *Kane* v. *Bloodgood*, 7 Johns. Ch. Rep. 90; *Murray* v. *Coster*, 20 Johns. Rep. 576.

Should the question of adverse possession arise upon another trial, the enquiry would be, whether the Society under whom the tenant claims, has disavowed a holding under the trust, or set up a claim to the property adverse to the title of the town; and this with a distinct knowledge on the part of the town of such disavowal or claim; and if so, whether

there has been since that time an uninterrupted occupation by the Society, or its tenant, of the land.

Should it turn out, however, that the right originally vested in the town in its parochial character, has passed to the incorporated Society, this question of adverse possession will not be material.

But it is contended that the case does not show that either the defendant or his lessors ever claimed a freehold, and that this possession must be regarded as subordinate to that of the town.

But it seems that the Congregational Society so far back as 1824, assumed the control of the parsonage, repaired and leased it from time to time, down to the lease to defendant in 1853; called meetings of the Society, claiming to own it, and with articles in the warning of such meetings, respecting the sale, or other disposition of it, by the Society; and we are not prepared to say there was not evidence from which the jury might have found an occupation, under claim of title, by the Society.

Nor do we understand it to be essential that the possession, to be adverse, should be under a claim of an estate equal to a freehold, but it is enough, we think, if the possession was under a claim of title to the land, although the title claimed was merely in trust for the use of the settled minister of that Society forever, and with no claim of a right to dispose of the fee.

It is true that a person who is wrongfully in possession of the land of another, cannot defeat a writ of entry by qualifying his entry, and showing that he claimed less than a freehold; but we think that when there is an actual ouster and the requisite length of possession, it is a good bar to a writ of entry, although the possession was under a claim of title to hold the land in trust for another.

Upon these views, the verdict directed by the Court must be set aside, and there must be

*A new trial.*